FILED
3/8/19 2:57 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 18-22149-GLT |
| | : | Chapter 7 |
| **CARRIE PINNICK**, | : | |
| | : | |
| *Debtor.* | : | |
| | : | |
| | : | |
| **CARRIE PINNICK**, | : | |
| | : | |
| *Movant,* | : | Related to Dkt. Nos. 57, 64 |
| | : | |
| v. | : | |
| | : | |
| **NO RESPONDENT**, | : | |
| | : | |
| *Respondent.* | : | |
| | : | |

Aurelius P. Robleto, Esq.          Robert Shearer, Esq.
Robleto Law                       Erie, PA
Pittsburgh, PA                    Attorney for the Chapter 7 Trustee
Attorney for the Debtor

### MEMORANDUM OPINION

The Debtor, Carrie Pinnick, surprised to learn that there is substantial non-exempt equity in her residence, now seeks to dismiss her case to prevent Robert Shearer, the chapter 7 trustee, (the "Trustee") from selling it to pay her creditors in full.[1]  The Trustee opposes the motion.[2]  For the reasons set forth below, the Court will deny the motion.

---

[1]      Debtor's Motion to Dismiss Bankruptcy Case, Dkt. No. 57.

[2]      Response to Debtor's Motion to Dismiss Bankruptcy Case, Dkt. No. 64.

## I.    BACKGROUND

The facts necessary to decide this matter are not in dispute.  The Debtor filed a voluntary chapter 7 petition on May 29, 2018.  On Schedule A/B, she listed a fee simple interest in real property located at 1424 Federal Street in Pittsburgh, Pennsylvania (the "Property") with a current value of $225,000.[3]   The Debtor's allowed exemptions in the Property total $24,515.[4] According to Schedule D, the Property is subject to two mortgages securing obligations to Wesbanco Bank, Inc. and the Urban Redevelopment Authority of Pittsburgh (the "URA"), respectively.[5]  Wesbanco Bank filed a proof of claim indicating the outstanding balance owed on the first mortgage is $73,709.25.[6]  The URA has not filed a proof of claim in this case, but the Debtor estimated the amount owed to be approximately $55,000.[7]

Notwithstanding the Debtor's estimate of the URA's claim, the loan appeared to present an additional complexity.  By way of background, the URA helped finance the purchase of the Property for $149,000 in 2009.  As reflected in an executed commitment letter dated November 16, 2009, an apparent condition of the URA financing was her agreement to a mechanism by which the URA could capture any appreciation if the Property was sold.[8] Specifically, the commitment letter provides in relevant part:

> If you sell the property less than five years from the date of closing, 100% of the Net Proceeds must be paid to the URA.  If you sell more than five years after closing, 75% of the Net Proceeds must be paid to the URA.  If

---

[3]        Schedule A/B: Property, Dkt. No. 1 at 10.

[4]        See Dkt. No. 38.

[5]        Schedule D: Creditors Who Have Claims Secured by Property, Dkt. No. 1 at 17.

[6]        Claim No. 3.

[7]        Schedule D: Creditors Who Have Claims Secured by Property, Dkt. No. 1 at 17.

[8]        Exhibit A, Dkt. No. 60.

the Net Proceeds are insufficient to pay off the [Neighborhood Housing Program Loan], the unpaid balance of the NHP Loan will be forgiven.[9]

The Debtor and her counsel interpreted this language to mean that the URA would hold back 75% of the net proceeds of any sale of the Property, resulting in an amount of equity that she could fully exempt under section 522(b)(2) of the Bankruptcy Code.[10]  Neither she nor her counsel contacted the URA to confirm their understanding or obtain a payoff figure.[11]

At the meeting of creditors held pursuant to section 341(a), the Trustee disagreed with the Debtor's interpretation of the above-quoted language.  Shortly thereafter, he contacted the URA and learned that it would seek no more than the amount it had financed from any sale of the Property—namely, $55,000.  Due to the Property's substantial non-exempt equity, a claims bar date was established and general unsecured claims totaling $15,959.08 were filed.[12]  The Trustee then sought and obtained Court approval to retain a Realtor to list the Property at $299,900.[13] Nearly two and a half months later, and in the face of a motion seeking to compel her to grant the Realtor access to the Property, the Debtor filed her motion requesting dismissal of the case.

The Court heard the motion and the Trustee's response on February 21, 2019.  In sum, the Debtor asserted that she filed this case in good faith, but now seeks dismissal to avoid the

---

[9]   Id. at 1.  "Net Proceeds" are defined as the gross sale proceeds less: the costs of sale; the outstanding principal balance of the first mortgage; the Debtor's down payment on the Property; the difference between $86,200 and the outstanding principal balance of the first mortgage; and any portion of the down payment recoverable grant that she is required to repay.  Id.

[10]  Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, et seq. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[11]  At the hearing on the motion, Debtor's counsel explained that he did not contact the URA because he did not find the commitment letter ambiguous in its requirements.

[12]  Nine unsecured creditors filed proofs of claim, only four of which are over $1,000.  The Court offers no opinion as to the ultimate allowability of these claims but notes that a few appear to be stale on their face.

[13]  The Court notes that the Debtor did not object to the employment of the Realtor, but instead indicated that she was assessing her options, including conversion, dismissal, or simply objecting to any proposed sale. See Dkt. No. 50.

"inequitable result of being forced from her home in service of [the Trustee]'s biased interpretation of the best interests of the creditors."[14]  Conversion to chapter 13 was not a viable option in light of her negative monthly net income and inability to propose a feasible plan.[15]  Instead, "[a]t 66 years of age, the Debtor is retired and wishe[d] to remain in her home while responsibly addressing her debts outside of bankruptcy."[16]  Her intention was to pay her creditors through a refinancing of the Property, presumably relying on the new-found equity.  The Debtor admitted, however, that she was unable to obtain a loan prepetition, and argued that such a refinancing was not possible while her chapter 7 case is pending.  She offered no explanation as to why a post-dismissal refinancing was more likely to occur.  In any event, the Debtor suggested that the impact of dismissal on her creditors would be negligible because they would all retain their state law rights to pursue her and her assets.  In response, the Trustee, though sympathetic, merely opined that the Debtor could not obtain a standard mortgage because of her negative monthly net income and, short of liquidating the equity in the Property, had no capacity to pay her creditors.

At the conclusion of oral arguments, Debtor's counsel expressly requested a "swift ruling."  After confirming that she had nothing further she wished to add to the record,[17] the Court denied the motion, finding that dismissal of the case would be unfairly prejudicial to creditors in the absence of a proposal assuring them payment in full.  Nevertheless, the Court stayed the Trustee's sale efforts for sixty-days to afford the Debtor an opportunity to explore alternatives that would protect the creditors.  The Court now memorializes its findings pursuant to Fed. R. Civ. P. 52(a)(1), made applicable to contested matters by Fed. R. Bankr. P. 7052 and 9014(c).

---

[14]    Motion, Dkt. No. 57 at ¶ 25.

[15]    See Schedule I: Your Income and Schedule J: Your Expenses, Dkt. No. 1 at 31-34.

[16]    Motion, Dkt. No. 57 at ¶ 12.

[17]    Audio Recording of Hearing Held in Courtroom C, February 21, 2019 at 11:15 a.m.

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## III.    DISCUSSION

A debtor does not have an absolute right to dismiss a chapter 7 case.[18] To the contrary, section 707(a) provides that the Court may dismiss a chapter 7 case "only for cause."[19] "Cause," however, is undefined. Nevertheless, the debtor as the moving party has the burden to demonstrate "cause," the sufficiency of which is left to the sound discretion of the Bankruptcy Court.[20] Consequently, three lines of cases regarding voluntary dismissals under section 707(a) have emerged with the primary difference being how prejudice to creditors is weighed in the court's analysis.[21]

The Debtor urges the Court to follow *In re Geller* which held that requests for dismissal "should generally be granted unless some 'plain legal prejudice' to creditors will

---

[18]    See In re Fleurantin, 420 F. App'x 194, 197 (3d Cir. 2011); Schwartz v. Smith (In re Smith), 507 F.3d 64, 72 (2d Cir. 2007); Sicherman v. Cohara (In re Cohara), 324 B.R. 24, 27 (B.A.P. 6th Cir. 2005); Bartee v. Ainsworth (In re Bartee), 317 B.R. 362, 366 (B.A.P. 9th Cir. 2004); Turpen v. Eide (In re Turpen), 244 B.R. 431, 434 (B.A.P. 8th Cir. 2000).

[19]    11 U.S.C. § 707(a).

[20]    See In re Boyce, No. CIV.A.04-1369, 2006 WL 3061633, at *4 (E.D. Pa. Oct. 26, 2006); In re Jong Hee Kang, 467 B.R. 327, 335 (Bankr. D.N.J. 2012); In re Jabarin, 395 B.R. 330, 337 (Bankr. E.D. Pa. 2008); In re Aupperle, 352 B.R. 43, 45 (Bankr. D.N.J. 2005).

[21]    See In re Jabarin, 395 B.R. at 337-339 (surveying the three approaches taken to voluntary dismissal).

otherwise result."[22]  "Plain legal prejudice" in this context means "'prejudice that is significant and real, not potential, when viewed in terms of the rights that debtors and creditors have after dismissal.'"[23]  Applying this standard, the court in *Geller* concluded that "generally, a debtor wishing dismissal of a case should obtain this result in all but extraordinary situations."[24]  This debtor-friendly approach has been criticized because it sets a high bar for *opposing* dismissal by requiring a creditor to *negate* "cause" with a showing of demonstrable prejudice.[25]  Of course, on the other end of the spectrum, there is a line of cases that hold voluntary dismissal should be denied upon a showing of *any* prejudice to creditors.[26]

In the Court's view, the middle ground—an interest balancing approach—most appropriately "affords bankruptcy courts the flexibility needed to make the equitable determination whether there is 'cause' for a voluntary dismissal under § 707(a)."[27]  As explained in *In re Aupperle*, "[i]n its simplest terms, the test turns on whether or not the dismissal is in the best interests of the debtor and the creditors of the estate, with particular emphasis on whether the dismissal would be prejudicial to creditors."[28]  This requires "a factually intensive assessment of

---

[22]   In re Geller, 74 B.R. 685, 690 (Bankr. E.D. Pa. 1987) (examining "cause" under both sections 707(a) and 1112(b)).

[23]   In re Jabarin, 395 B.R. at 338 (quoting Barry v. Sommers (In re Cochener), 382 B.R. 311, 334 (S.D. Tex. 2007), rev'd, 297 F. App'x 382 (5th Cir. 2008)).

[24]   In re Geller, 74 B.R. at 689.

[25]   See In re Mech. Maint., Inc., 128 B.R. 382, 387 (E.D. Pa. 1991); In re Jabarin, 395 B.R. at 338.

[26]   See In re Turpen, 244 B.R. at 434; In re Haney, 241 B.R. 430, 432 (Bankr. E.D. Ark. 1999); In re Harker, 181 B.R. 326, 328 (Bankr. E.D. Tenn. 1995).

[27]   In re Jabarin, 395 B.R. at 339.  Notably, after surveying the case law, Judge Frank in *Jabarin* suggested that despite differently articulated standards, all courts may be employing the same analysis on a practical level. Id.

[28]   In re Aupperle, 352 B.R. at 46 (citing In re McCullough, 229 B.R. 374, 376 (Bankr. E.D. Va. 1999) and In re Stephenson, 262 B.R. 871, 874 (Bankr.W.D.Okla.2001)) (citations omitted).

the debtor's reasons for requesting dismissal and of the impact dismissal can be expected to have on the creditors."[29]

The starting point of the Court's analysis in this case is a recognition that the proposed sale of the Property will pay all creditors in full in the near future.[30]   A sale price anywhere between the Debtor's estimated fair market value of $225,000 and the Trustee's list price of $299,900 will yield cash to the Debtor in the approximate range of $55,000 to $125,000. Unfortunately, the Debtor, who is sixty-six years old and retired with minimal income, would be displaced from her home.  The Court is also mindful that her unsecured debt, which is at most only $15,959.08, is relatively small compared to her equity in the Property.

The Debtor argues that after having filed her case is good faith, "cause" now exists to dismiss it because bankruptcy relief is no longer available to her under the circumstances.  The Court finds no reason to doubt her good faith in either filing this case or in seeking to dismiss it. The Debtor's reading of the commitment letter was reasonable, and she was undoubtedly surprised by the URA's position.[31]   That said, it is an exaggeration to say that bankruptcy relief is not available to her—a trustee can still liquidate her non-exempt assets for the benefit of her creditors while she enjoys a respite curtesy of the automatic stay.[32]   The only relief that she cannot obtain is a discharge of her unsecured debt *without payment*, but that is never guaranteed to any debtor. Although it seems clear that the Debtor would not have filed this case had she known that the Property could be sold by the Trustee, a mistaken belief that the home would be protected in

---

[29]     In re Jabarin, 395 B.R. at 339.

[30]     If a sale does not manifest, the Trustee will abandon the Property and the Debtor will receive a discharge, having suffered no prejudice from the Trustee's attempt administer the asset.

[31]     The Court offers no opinion as to the reasonableness of any omission of counsel.

[32]     The Court notes that the automatic stay in this case has been in place for nine months.

bankruptcy is not, by itself, a reason to dismiss a case once filed.[33]  Indeed, creditors have an

interest in receiving a distribution from an "unexpected" non-exempt asset.[34]  Certainly, the loss

of one's home is a significant detriment, but it must be weighed against the prejudice to the

creditors that would result from the dismissal of the case.

        In the first instance, the Debtor contends that a return to the *status quo ante* will

have a negligible impact on her creditors because "[t]hey are generally not prejudiced by dismissal

since they will no longer be stayed from resorting to the state courts to enforce and realize upon

their claims."[35]  While that may be generally true, other courts have recognized that once specific

assets have been targeted "[p]rejudice in this context includes . . . the effect of the loss of a

'motivated fiduciary' (the trustee) on the creditors."[36]  This is particularly of concern where "the

realistic probability [exists] that no creditor's claim is large enough to make it financially feasible

or rewarding for it to" execute on its claim.[37]  Here, only four general unsecured creditors have

claims over $1,000, and none are over $5,000.  In the absence of the Trustee's sale on behalf of all

creditors, the Court finds it substantially less likely that any creditor would be motivated enough

outside of bankruptcy to seek payment from the Property.  Even if one did, however, the liquidation

value obtained at a forced sale may be insufficient to pay all claims (including the URA's claim),

---

[33]    See Maixner v. Surratt-States (In re Maixner), 288 B.R. 815, 818 (B.A.P. 8th Cir. 2003) ("As best we can
discern, Debtor's only basis for requesting dismissal was that Debtor wanted to protect his home from his
creditors. A debtor's desire to save for himself the equity in his home to the detriment of his creditors is not
grounds for a voluntary dismissal."); In re Hopper, 404 B.R. 302, 309 (Bankr. N.D. Ill. 2009) ("Debtor's
mistaken belief that she could retain her residence and a receive a discharge of all her dischargeable debts
does not constitute 'cause' within the meaning of § 707(a).").

[34]    In re Jabarin, 395 B.R. at 342 (concluding that the discovery of assets is grounds for retaining jurisdiction).

[35]    In re Schwartz, 58 B.R. 923, 925 (Bankr. S.D.N.Y. 1986); see In re Hull, 339 B.R. 304, 309 (Bankr. E.D.N.Y.
2006).

[36]    In re Jong Hee Kang, 467 B.R. at 335; see In re Jabarin, 395 B.R. at 342.

[37]    In re Jabarin, 395 B.R. at 342.

to say nothing of its possible impact on the Debtor.[38]   Therefore, the Court concludes that the reversion to their state law rights is not the functional equivalent of full payment from the contemplated bankruptcy sale, resulting in prejudice to the general unsecured creditors.[39]

To eliminate the prejudice to the unsecured creditors, the Debtor must possess a reasonable means to pay them all in full.  By her own admission, the Debtor's monthly net income is negative, and she has no capacity to meaningfully increase her income or trim her expenses. Thus, extracting equity from the Property is the only viable source of funding, which can only occur from a secured loan transaction or sale.

The Debtor's preference is, understandably, to refinance of the Property.  Although she was unable to obtain a loan prepetition, the Court concedes that the "newly-found" equity could change a lender's assessment of the prospect.  On the other hand, the Debtor's minimal income may prevent a material change in the calculus.   In sum, the proposition is necessarily speculative, and far from a "a concrete or viable plan."[40]   Regardless, assuming that such a refinancing is possible, the Debtor has not persuaded this Court that her pending chapter 7 case is an obstacle to it occurring.  Accordingly, if a refinance of the Property is the solution, the creditors should have the safety net of the bankruptcy until the transaction closes.

Obviously, the sale alternative is precisely what the Trustee proposes, and the Debtor seeks to avoid.  If that is the only way to pay the creditors, however, a voluntary sale in bankruptcy offers more protection to the creditors by ensuring it occurs while adding only a modest administrative expense.  These administrative expenses have already begun to accrue given that

---

[38]     The Debtor's share of any net sale proceeds would be reduced by a lower sale price as well as the unavailability of bankruptcy exemptions.

[39]     For this reason, it appears that even had the Court adopted the *Geller* standard of prejudice the Debtor would not have prevailed on the motion.

[40]     In re Hopper, 404 B.R. at 309.

the Debtor's case is now nine months old, meaning that the Trustee would also suffer prejudice upon dismissal.  Cooperating with the Trustee also affords the Debtor the best opportunity to maximize the ultimate sale price and, in turn, her share of the proceeds with which to commence her fresh start.

The Debtor argues that this case is remarkably similar to *In re Aupperle*, a case in which the debtor was permitted to dismiss her chapter 7 case after the trustee decided to pursue the non-exempt equity in her residence.[41]  The Court disagrees, and finds the facts distinguishable in several respects, most notably that: the sale would only have resulted in payment of less than 50% of the claims against the debtor; the debtor would have received only about $19,000 from the sale; and the debtor's son provided an additional source of income to assist her with her debts.[42]  The court also required the debtor to pay the chapter 7 administrative expenses as a condition of dismissal,[43] whereas here, it does not appear this Debtor has an ability to do so.  In any event, the Court finds this case more akin to *In re Hopper*, where the court denied the debtor's motion to dismiss, citing the debtor's inability to pay her creditors outside bankruptcy and the fact that the sale of the non-exempt residence "represent[ed] the creditors' best opportunity for obtaining satisfaction of their claims."[44]

In the end, the Court's analysis leads to the conclusion that dismissal is not in the best interests of the Debtor and creditors.  In bankruptcy, it appears that all creditors will be paid in full.  Outside of bankruptcy, her resources are simply inadequate to ensure they will be made whole.  Though a sale of the Property unfortunately will result in the Debtor losing her home, the

---

[41]    In re Aupperle, 352 B.R. at 48.

[42]    Id. at 44, 46.

[43]    Id. at 48.

[44]    In re Hopper, 404 B.R. at 309-311.

blow will at least be mitigated by a share of sale proceeds estimated to be between $55,000 and

$125,000.[45]  The fact that the claims against her are relatively modest compared to the equity in

the Property does not alter the balance as the creditors are entitled to be paid.  At best, the

substantial equity cushion suggests that there may be alternative solutions that the Debtor has not

explored.  For that reason, the Court will impose a sixty-day moratorium on the Trustee's sale

efforts to afford her an opportunity to find such a solution.

## IV.    CONCLUSION

In light of the foregoing, the Court will deny the motion to dismiss without

prejudice and impose a sixty-day stay on the Trustee's sale efforts.  This opinion constitutes the

Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The

Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

_____
GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Dated: March 8, 2019

Case administrator to mail to:
Aurelius Robleto, Esq.
Robert Shearer, Esq.

---

[45]     The upper end of this estimated range represents an equity return to the Debtor equivalent to nearly 86% of
the purchase price paid for the Property less than ten years earlier.